McHugh, J.
UNDISPUTED FACTS
Based on the summary judgment record the parties have compiled and placed before the Court, it appears that AMD is a wholesaler of candy, tobacco products, and groceries in Massachusetts and other New England states. Southland is the owner of the 7-Eleven service mark and convenience store chain. 7-Eleven stores are operated by individual franchisees. In early 1994 Southland entered into a franchise agreement with Nevi Sabet under which Mr. Sabet, as franchisee, used the 7-Eleven service mark in the operation of a convenience store (“7-Eleven store”) at 460 Smith Street, Providence, Rhode Island. Mr. Sabet operated the store as a 7-Eleven from approximately April 1994 through December 1997.
In a letter dated January 23, 1995, Southland, through its Field Consultant, Jack Tibert, requested that AMD set up a charge account to sell cigarettes and other goods on credit to two 7-Eleven stores, including the store at 460 Smith Street, Providence, Rhode Island. Mr. Tilbet’s request stated that the “charge account [would be] paid out of our office” and his letter contained the address of a 7-Eleven facility in Middletown, CT, where AMD was to “[s]end [b]ills.”
AMD complied with Mr. Tilbert’s request and set up the charge account. AMD’s credit manager, Margaret Smith, did not understand or inquire into the relationship between Sabet and Southland. In setting up the charge account, AMD relied upon Southland’s credit, not Mr. Sabet’s. AMD was not a party to Mr. Sabet’s franchise agreement nor was it provided with a copy of that agreement. AMD’s Sales Representative, Dennis Costello, understood that Mr. Sabet operated the 7-Eleven store as a franchise, but Mr. Costello never discussed with Mr. Sabet anything about the details of Mr. Sabet’s relationship with Southland. No oral or written agreement between AMD and Southland exists in which AMD agreed that Southland was an agent for Mr. Sabet’s store. Indeed, Southland first explicitly told AMD that 7-Eleven franchisees are independent contractors, that the goods delivered by AMD were purchased by the 7-Eleven stores and not Southland and that Southland assumed no liability for the debts *569 of its franchisees in a letter dated January 9, 1998, after the present controversy.
From about January, 1995, until December, 1997, AMD received orders for cigarettes and other goods from Mr. Sabet in the name of his 7-Eleven store and delivered the ordered goods to the 7-Eleven store. Mr. Sabet or some employee of the 7-Eleven store inspected the goods when they were delivered and signed the AMD invoices tendered to him or her by the delivery person. Mr. Sabet or some other store employee then sent the invoices to Southland.
AMD’s Ms. Smith sent bills for goods delivered to the 7-Eleven store to a Southland office in Connecticut. Southland then paid AMD by checks drawn on a Southland bank account and charged the payment amounts to Mr. Sabet’s account with Southland. At the end of each business day, Mr. Sabet deposited the 7-Eleven store’s receipts into his Southland account, thus allowing Southland to reimburse itself for the payments it had made for goods delivered to his store. Periodically, Southland sent Mr. Sabet a check to pay him the difference between the goods for which South-land had paid and the receipts he had deposited into his Southland account.
When AMD had questions about invoices or statements, Ms. Smith typically resolved them by calling a woman named “Denise” in Southland’s accounts payable department in New Jersey, although Mr. Costello brought at least some invoice questions to the attention of Mr. Sabet, or one of his managers, at the 7-Eleven store.
Until approximately September or October, 1997, AMD received checks from Southland for goods AMD delivered to the 7-Eleven store. On December 31, 1997, the unpaid balance for those goods amounted to $49,275.61. Of that amount, $41,520.64 was for cigarettes and $7,754.97 was for other merchandise.
On or about January 5, 1998, Ms. Smith, the AMD Credit manager, called Denise to inquire about payment. Denise said that Southland would pay the debt in full within a few weeks. AMD, however, received no payment. Ms. Smith called Denise again on January 29, 1998. This time, Denise told Ms. Smith to call Paul Donahue, Southland’s market manager for Massachusetts and Rhode Island. Ms. Smith called Mr. Donahue the same day and inquired as to the status of payment. Mr. Donahue told Ms. Smith that South-land was not responsible for the debt, that Mr. Sabet owed the money to AMD and that AMD should look to him for payment.
DISCUSSION
A. Applicable Law
Until recently, the principles governing summary judgment in Massachusetts were those the Supreme Judicial Court had articulated in Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Under those principles,
[t]he party moving for summary judgment assumes the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue, even if he [or she] would have no burden on an issue if the case were to go to trial. .. If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment.
(Footnote omitted).
In the recent case of Kourouvacilis v. General Motors Corp., 410 Mass. 706 (1991), however, the Court embraced the principles set forth by the Supreme Court of the United States in Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Under those principles,
a party who moves for summary judgment has the burden of initially showing that there is an absence of evidence to support the case of the nonmoving party shouldering the burden of proof at trial.[1] That burden is not sustained by the mere filing of the summary judgment motion or by the filing of a motion together with a statement that the other party has produced no evidence that would prove a particular necessary element of this case. The motion must be supported by one or more of the materials listed in rule 56(c) and, although that supporting material need not negate, that is, disprove, an essential element of the claim of the party on whom the burden of proof at trial will rest, it must demonstrate that proof of that element at trial is unlikely to be forthcoming.
Kourouvacilis, supra, 410 Mass. at 714. As a consequence, there are now two ways in which the party moving for summary judgment may meet the burden imposed by Mass.R.Civ.P. 56. The first of those follows traditional Massachusetts law:
[T]he moving party may submit affirmative evidence that negates an essential element of the nonmoving party’s claim.
Kourouvacilis, supra, 410 Mass. at715 quoting Celotex Corp. v. Catrett, supra, 477 U.S. at 331-32 (Brennan, J., dissenting).
Second, however,
the moving party may demonstrate to the court that the nonmoving party’s evidence is insufficient to establish an essential element of the nonmoving party’s claim ... If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law . . . Plainly, a conclusory assertion that the non-moving party has no evidence is insufficient . . . Such a “burden” of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment *570 . . . Rather, ... a party who moves for summary judgment on the ground that the nonmoving parly has no evidence must affirmatively show the absence of evidence in the record.

Id.

Put another way,
a party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he [or she] demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case. To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party’s claim.
Kourouvacilis, supra, 410 Mass. at 716.
In applying that standard,
[w]here a moving party properly asserts that there is no genuine issue of material fact, “the judge must ask himself [or herself] not whether he [or she] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). A judge’s mere belief that the movant is more likely to prevail at trial is not a sufficient basis for granting summary judgment.
Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
Those, then, are the principles the Court must apply to the motions defendants have filed here.
B. Application of Law to Fact
The heart of Southland’s defense is that although it paid AMD for goods delivered to the 7-Eleven store, Southland did so not as a principal but as an agent for Mr. Sabet, the 7-Eleven store’s operator.[2] If South-land intended to act as an agent, however, it had a duty to disclose its agency status and the identity of its principal, if it was to avoid liability on the contract it entered with AMD. Atlantic Salmon A/S v. Curran, 32 Mass.App.Ct. 488, 492 (1992). See also Merriam v. Wolcott, 85 Mass. 258, 261 (1861). There is no evidence in the summary judgment record that AMD had actual knowledge prior to January 1998 that South-land was not a principal but acted as an agent for the 7-Eleven store, much less that AMD had actual knowledge of the specific arrangement between Southland and the 7-Eleven store, which Southland devotes the majority of its brief to summarizing. Without evidence of notice, Southland’s summary of its relationship with Mr. Sabet is simply irrelevant, as is Southland’s discussion of decisions in other jurisdictions that have recognized 7-Eleven franchisees to be independent contractors and not Southland agents.
The facts to which Southland points in support of the proposition that AMD was on notice that South-land acted as an agent for the 7-Eleven store are insufficient to create a genuine issue of material fact on the question whether AMD was on notice of the 7-Eleven store’s independent status. Southland, for example, observes that its letter dated January 23, 1995 asked AMD to “set up an account for our stores . . . These stores need to be a charge account paid out of our office." No fair reading of that sentence remotely suggests that the 7-Eleven store was an independent store. In fact, a fair reading is at best unhelpful either way and at worst, from Southland’s vantage, unhelpful.
Southland also asserts that Costello knew of the 7-Eleven store’s status as a Southland franchisee. But franchisee status is neither monolithic nor self-defining. More important, it is undisputed on this record that AMD had no actual knowledge of the specific arrangement between Southland and the 7-Eleven store or of the general arrangements between South-land and its franchisees or of the fact that Southland intended to pay AMD only as long as Mr. Sabet paid Southland enough money to do so.
Similarly unavailing are Southland’s claims that it did not order, accept delivery of or inspect and accept goods from AMD and that it was not a “merchant” as that term is used in the Uniform Commercial Code. This case turns on whether a reasonable person in the position of AMD would discern that Southland was an agent and not a principal and not on facts of which AMD had no actual knowledge and that Southland did not attempt to communicate to AMD until it was too late to make a difference. Cf. Rothschild Sunsystems, Inc. v. Pawlus, 514 N.Y.S.2d 572, 573 (App.Div. 1987).
Finally, AMD had no duty to inquire whether South-land was acting as an agent: “The duty rests upon the agent, if [it] would avoid personal liability, to disclose [its] agency and not upon others to discover it . . . There is no hardship to the agent in this rule, as [it] always has it in [its] power to relieve [itjself from personal liability by fully disclosing [its] principal and contracting only in the latter’s name. If [it] does not do this, it may well be presumed that [it] intended to make [it]self personally responsible.” Atlantic Salmon A/S, supra, 32 Mass.App.Ct. at 493, quoting 1 Mechem on Agency §1413 (2d ed. 1914). See also New England Whalers v. Nair, 474 A.2d 810, 813 (Conn.App. Ct. 1985), quoting 3 C.J.S. Agency §369 (“where the agent contracts as ostensible principal, regardless of [its] intention and notwithstanding [its] lack of personal interest in the consideration, [it] will be personally liable on the contract as if [it] were the principal”).
ORDER
In light of the foregoing, it is hereby ORDERED that
1. Defendant’s Motion for Summary Judgment is DENIED.
*571 2. Plaintiff s Motion for Summary Judgment is ALLOWED.
3. Judgment will enter in favor of Plaintiff against Defendant in the amount of $49,275.61, plus appropriate interest.

Kourouvacilis did not change the proposition that the moving party must show the absence of any genuine issue of material fact before the non-moving party will be required to file any affidavit-based response of any kind. Smith v. Massimiano, 414 Mass. 81, 85-86 (1993).

In addition, AMD contends that $41,520.64 of the amount in dispute results from the purchase of cigarettes and that, under R.I. Gen. Laws §44-20-2, cigarette distributors and dealers must be licensed by the State. AMD claims that the 7-Eleven store was not licensed and suggests that South-land therefore somehow had to have been selling the cigarettes for its own account. Southland, however, counters that the 7-Eleven store in fact was licensed. Neither party has submitted evidence cognizable under Mass.R.Civ.P. 56 in support of their claims, and this Court need not resolve their dispute on that point to decide the pending cross-motions for summary judgment.